Filed 11/24/14  P. v. Esquivel CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FERMIN GUADARAMA ESQUIVEL,<br><br>    Defendant and Appellant. | H039035<br>(Santa Clara County<br>Super. Ct. No. CC955951) |

Defendant Fermin Guadarama Esquivel appeals a judgment of conviction for multiple sexual offenses against three minors.  On appeal, defendant asserts the trial court erred in admitting certain evidence, including expert testimony regarding child sexual abuse accommodation syndrome (CSAAS).  Defendant also argues the trial court erred in ordering victim restitution.

**STATEMENT OF THE FACTS AND CASE**

The incidents that gave rise to the criminal action in this case involved three minors, E.D., M.D. and L.D., and all occurred in an apartment in San Jose where they lived, along with defendant, who was their uncle.  E.D. and L.D. are sister and brother, and M.D. is their step-brother.

Defendant came to the United States from Mexico in July 1998, and moved into the apartment where the minors lived some time during 1998 or 1999 and lived there for about eight or nine months.  Defendant moved out of the apartment in 1999 or 2000.

Defendant went back to Mexico in July 2003 after his father died. He stayed there for almost two years before returning to the United States. He did not go back to Mexico again until January 2009, when he went to visit his son.

### *Victim E.D.*

During the time E.D. lived in the apartment, she was molested by two differed men. One was Balbino Acevedo and the other was defendant. E.D. did not confuse the two men, because Acevedo is much older than defendant. Acevedo's molestation was earlier in time than defendant's, and the acts were more frequent and more serious.

When E.D. was about seven or eight years old, she was outside the apartment, and defendant asked her to come in and sit next to him in the living room. E.D. sat in front of defendant on the couch, facing away from him, and he touched her breast, vagina, and buttocks over her clothes. Other people were in the apartment at the time, but no one was in the same room.

After defendant moved out of the apartment to return to Mexico, he came back to visit and stayed in the apartment. During one visit, he quickly touched E.D.'s face and body over her clothing.

At one point when she was 11 years old, E.D. told M.D. about what defendant had done to her. M.D. told E.D. that defendant had molested him too. E.D. also told M.D. that Acevedo had molested her. They did not discuss specific details.

E.D. told her father about Acevedo's acts when she was about 16 years old. They talked about calling the police to report the molestations, but E.D. decided not to do so.

E.D. told her mother about Acevedo's acts in March 2009. Her mother reported Acevedo's molestation to the police. After her mother's report, E.D. met with Officer Duran on April 29, 2009, and he asked her about what had happened to her. E.D. told Duran what Acevedo had done, but she did not mention anything defendant had done.

2

A few months later, E.D.'s mother confronted E.D. when she caught her drinking alcohol, and she asked E.D. if anyone else had molested her. E.D. told her about defendant. M.D was present during that conversation.

E.D.'s mother told her that she had to report defendant to the police, and she brought E.D, L.D., and M.D. to the police station on May 28, 2009. E.D.'s mother told Officer Tran that she wanted to make a report about defendant who lived in her home on and-off between 1995 and 1999, and who had allegedly molested the three children. E.D.'s mother also told Tran that some family members had known about the incidents since 2007. E.D.'s mother said the family did not report the incidents in 2007 because defendant was living in Mexico, and she learned a month earlier that he might be living in the United States.

E.D. spoke with Officer Pham on June 3, 2009. She told him that she was molested by a live-in uncle twice when she was seven or eight years old. E.D. said the first time was at about 6:00 p.m., while her mother and brothers were sleeping and her father was at work, and that defendant had touched her vagina, breast, and buttocks over her clothes. The second time, defendant came to visit and touched her over her clothes and on her face and lips while other family members were in another room. E.D. told Pham that she told M.D. about the incidents when she was about 12 years old.

### *Victim M.D.*

When M.D. lived in the apartment, M.D. remembered waking up one morning, when he was about six or seven years old, and seeing defendant walking out of his room. M.D. was clothed, and he did not remember defendant touching him. About a day or two later, M.D. woke up and felt defendant in bed with him. M.D.'s pants were pulled down slightly, and he felt moisture on his buttocks. M.D. was laying on his side, and he felt defendant's hand pulling or tugging him between his waist and rib cage, and the tip of

3

defendant's penis touching him between the cheeks of his buttocks. Defendant was in the bed with M.D. for about six or seven minutes.

M.D. remembered similar activity happening about six times during a one-month period. Each time M.D. had been in bed after his mother left for work, and no one else was in the room. Each incident occurred on a weekday around 6:00 or 7:00 a.m., in the spring or summer, before M.D. went to school. Defendant told M.D. that everything was okay, and that it was their "secret." Defendant never used force on M.D., other than tugging or pulling him close. M.D. was afraid that if he said anything about what was happening, it could cause problems for his family. M.D. and his family moved to a new apartment about one to three weeks after the last incident.

When M.D. was about 12 years old and in sixth grade, he told L.D. and E.D. what defendant had done to him. E.D. told him that something also had happened to her. L.D. did not tell M.D. that anything had happened to him. M.D. also told his mother about what happened at about the same time. They did not report anything to the police.

In May 2009 M.D. learned from E.D.'s mother that E.D. and L.D. had decided to report defendant to the police. He did not know how E.D.'s mother learned that anything had happened to him because he never told her. M.D. decided he would also talk to the police, and he went to the police station with E.D., L.D., and E.D.'s mother.

M.D. spoke with Officer Tran. He said that defendant had molested him five times in the spring of 1997. M.D. said that he woke up and found defendant in his bed. Defendant told M.D. to be quiet and pulled down his underwear and penetrated his buttocks. When defendant was finished, he told M.D. not to tell his mother. M.D. also told Tran that defendant had given him gifts to keep him quiet. M.D. said that he told his mother about the incidents in 2003, but that the family decided not to do anything because defendant was living in Mexico.

4

*Victim L.D.*

One afternoon during the summer when L.D. was about eight or nine years old, defendant took him into his mother's room and put a pornographic movie on the television. Defendant threatened L.D. verbally and told him to take his clothes off. Defendant grabbed L.D., sat him on his lap, and penetrated his anus with his penis. L.D. tried to get away, but defendant had locked the door and was holding him. Defendant touched L.D.'s penis and had L.D. touch his penis. The incident ended when L.D. pulled up his pants and defendant went into the kitchen. Defendant told L.D. that if he told anyone, defendant would kill him and his parents.

L.D. said that defendant also touched him twice in defendant's bedroom. On those occasions, defendant asked L.D. to go into his bedroom, and defendant closed the door. He put his penis in L.D.'s buttocks, and had L.D. touch his penis. Defendant also threatened L.D. and used force to get him into the bedroom, but defendant never hit him.

The first person L.D. told about the incidents was his uncle Alexander, when L.D. was about 17. Within a year, L.D. went to the police station with E.D.'s mother, E.D., and M.D., on May 28, 2009, to report defendant's acts. L.D. spoke with Officer Tran and told him that defendant had sex with him six times in 1998 or 1999, and that defendant had punched L.D. in the back three times he had resisted. L.D. also told Tran that defendant had threatened to kill him if he told anyone.

L.D. spoke with Officer Pham on June 3, 2009, saying that there had been four or five molestations when he was between the ages of seven and nine. One molestation occurred in his mother's room, and three occurred in defendant's room. L.D. said that each incident had occurred around noon, and that defendant had hit him once. L.D. also said that defendant had touched L.D.'s penis and made L.D. touch his penis, and that defendant had once sodomized L.D. L.D. also told Pham that his mother had almost observed defendant during one incident. L.D. said that the first person he told about the

5

incidents was his mother, about a month earlier. He came forward due to family problems, financial problems, and because he was not doing well in school. L.D. also told Pham about the time he and his father saw defendant at a gas station and followed him.

In 2010, defendant was charged by information with five counts of lewd or lascivious acts on a child under 14 (counts 1-5; Pen. Code, § 288, subd. (a))[1]; four counts of aggravated sexual assault on a child under 14 (counts 6-9; § 269); and four counts of lewd or lascivious acts on a child under 14 by force (counts 10-13; § 288, subd. (b)). The information also alleged that defendant was eligible for sentencing under the one strike scheme for committing offenses against more than one victim. (§ 667.61, subds. (b) & (e).)

After a first trial ended in a mistrial because the jury reached an impasse, a second jury found defendant guilty of five counts of lewd or lascivious acts on a child under 14, three counts of aggravated sexual assault on a child under 14 (all but count 9), and three counts of lewd or lascivious acts on a child under 14 by force (all but count 13). The jury also found true the multiple-victim allegations.

On November 19, 2012, the trial court sentenced defendant to five consecutive prison terms of 15 years to life on counts 1, 2, 6, 7, and 8, for a total term of 75 years to life. The court also imposed concurrent sentences of 15 years to life on counts 3, 4, and 5. The court stayed sentence on counts 10, 11, and 12, since those convictions were based on the same acts as those underlying counts 6, 7, and 8. The court also ordered defendant to pay victim restitution for one of the victim's mental health services.

## DISCUSSION

Defendant asserts on appeal that the trial court made numerous errors in the admission of evidence. Specifically, defendant argues the court erred by admitting

---

[1] All further statutory references are to the Penal Code.

6

evidence the Acevedo had been convicted of molesting E.D. In addition, defendant argues that the court erred in admitting expert testimony regarding CSAAS, and admitting evidence that E.D.'s family was threatened with harm if E.D. testified against defendant. Finally, defendant asserts there was error in the court's order of victim restitution

### *Evidence of Acevedo's Conviction*

During trial, the court allowed defense counsel to question E.D. about her accusations regarding the molestation by Acevedo. Specifically, defense counsel sought to address inconsistent statements E.D. made about the molestation by both men. During the course of the direct and cross examinations of E.D., the court notes that it had inadvertently referenced Acevedo's conviction for the molestation to the jury.

Counsel met with the court to address the issue of the jury's knowledge of Acevedo's convictions. The court noted that it would give the jury a special instruction regarding Acevedo's conviction and E.D.'s credibility. The court instructed the jury as follows: "[O]n May 24, 2012, Mr. Balbino Acevedo was convicted. [¶] . . . [¶] As to Mr. Acevedo's trial, this fact by itself is not sufficient to bolster or discredit a witness. I will be reading the appropriate witness evaluation standards. You have already had it [*sic*] before we started the trial. [¶] Those factors that go towards believability are extremely important as it relates to this trial, as it pertains to that particular—all witnesses, but it is not to be given any significant weight. [¶] That fact, the fact of her testimony, we're talking about [E.D.], is not sufficient by itself to prove that Mr. Esquivel is guilty of the accusations in Counts 1 through 13. The People must still prove each element of every charge beyond a reasonable doubt."

Defendant argues the trial court erred by admitting evidence that Acevedo had been convicted of molesting E.D. He asserts the evidence was irrelevant, and was more prejudicial than probative. (Evid. Code, § 350).

7

Evidence Code section 351 provides that "all relevant evidence is admissible." Relevant evidence is defined as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) However, the trial court has "wide discretion" in deciding the relevance of evidence. (See Evid. Code, § 352; *People v. Kelly* (1992) 1 Cal.4th 495, 523.) This court will not disturb a trial court's exercise of discretion in admitting or excluding evidence "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation.]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

The standard of review for Evidence Code section 352 challenges is abuse of discretion. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) On appeal, " '[a] trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered. [Citation.]' [Citation.]" (*People v. Green* (1995) 34 Cal.App.4th 165, 182-183.)

The trial court's decision to allow the jury to know that Acevedo had been convicted for molesting E.D. was not an abuse of discretion. Defense counsel initiated the line of inquiry by pursuing questions in cross-examination regarding E.D.'s accusations against Acevedo. Defense counsel was attempting to elicit a response that would demonstrate prior inconsistent statements. During this process, including direct examination, the fact that Acevedo had been tried for his conduct was revealed. If was *after* this revelation that the court decided to instruct the jury regarding the conviction,

8

and the fact that the conviction would not be used to bolster E.D.'s credibility at trial. The court's explanation to the jury, in conjunction with its curative instruction and the standard instructions regarding witness credibility, and the prosecution's burden of proof reduced any prejudice that might have occurred as a result of the revelation of the conviction. Generally, we presume that jurors follow the court's instructions. (See *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) The court did not abuse its discretion in allowing evidence of Acevedo's conviction to be admitted.

### Evidence of Threats to E.D.'s Family Members

During trial, E.D. was questioned about the alleged threats that were made against her family members. When E.D. stated that threats were made to her grandmother, and she learned about them from her mother, who had spoken to her grandmother. Defendant objected to the evidence as multiple levels of hearsay. The court overruled the objection and instructed the jury as follows: "The evidence of threats to various persons by third parties is admissible only to show that these threats, if true, played some part in the witness's state of mind, attitude, bias, actions, prejudice, or lack of prejudice, not that any threats were actually delivered. [¶] So, in other words, that's the sole basis for this evidence coming in."

Defendant asserts that the trial court erred in admitting evidence that threats had been made to E.D.'s family if she testified against defendant. He argues the statements were unreliable, and constituted multiple levels of hearsay.

"Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations, including Evid. Code, § 780.] An explanation of the basis for the witness's fear is likewise relevant to [his or] her credibility and is well within the discretion of the trial court." (*People v. Burgener* (2003) 29 Cal.4th 833, 869 (*Burgener*); see also *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1367-1369 (*Olguin*).) Moreover, "it is not necessary

9

to show the witness's fear of retaliation is 'directly linked' to the defendant for the threat to be admissible. [Citation.] It is not necessarily the source of the threat—but its existence—that is relevant to the witness's credibility." (*Burgener*, at pp. 869-870; *Olguin*, at p. 1368.)

As the Court of Appeal explained in *Olguin*: "[T]he fact a witness is testifying despite fear of recrimination is important to fully evaluating his or her credibility. For this purpose, it matters not the source of the threat. . . . [¶] . . . [¶] Regardless of its source, the jury would be entitled to evaluate the witness' testimony *knowing* it was given under such circumstances. And they would be entitled to know not just that the witness was afraid, but also, within the limits of Evidence Code section 352, those facts which would enable them to evaluate the witness' fear. A witness who expresses fear of testifying because he is afraid of being shunned by a rich uncle who disapproves of lawyers would have to be evaluated quite differently than one whose fear of testifying is based upon bullets having been fired into her house the night before the trial. The trial court acted well within its discretion in insuring the jury would have such evidence and would properly evaluate it." (*Olguin, supra*, 31 Cal.App.4th at p. 1369.)

Here, the court properly admitted the evidence of threats to E.D.'s family members. The evidence was relevant and offered to demonstrate E.D.'s state of mind at the time of testifying. Moreover, the court admonished the jury twice that the threats were only offered for the purpose of showing E.D.'s mental state while testifying. We presume jurors followed the court's limiting instructions, and did not use the evidence for another purpose. (*People v. Mickey, supra* 54 Cal.3d at p. 689, fn. 17.)

### *Evidence of CSAAS*

During trial, Carl Lewis testified as an expert witness for the prosecution regarding CSAAS. Mr. Lewis explained that CSAAS encompasses five categories of behavior: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed,

conflicted, and unconvincing disclosure; and (5) retraction. Not all five categories appear in every case. Secrecy can occur when abusers tell the child not to say anything or the child will get in trouble or not be believed. Helplessness describes a child's dependence on adults for many things in their lives, and the inability to make the abuse stop. Entrapment and accommodation can be demonstrated by children feeling trapped in the abuse, and appearing emotionless when they report it. Delayed disclosure refers to the fact that there is often a delay between the abuse and its disclosure. Finally, retraction refers to the situation where a child makes a disclosure of abuse, but later denies that it happened or minimizes it after it is reported outside the family.

In addition to Mr. Lewis, Dr. Annette Ermshar testified as a defense expert on CSAAS. She stated that CSAAS is an unscientific "clinical observation," which has no meaning as a diagnosis. Dr. Ermshar also stated that CSAAS was being misused and misrepresented in legal settings, because the presence of the symptoms and behaviors does not allow one to state that a child was abused.

Defendant asserts that the trial court erred in admitting evidence of CSAAS, because the evidence was not probative and was prejudicial, was irrelevant and violated his due process rights to a fair trial.

This court has repeatedly rejected defense claims that CSAAS expert testimony is inadmissible at trial. As we stated in *People v. Perez* (2010) 182 Cal.App.4th 231, 245, "[W]e discern no reason to depart from recent precedent, to wit: 'CSAAS cases involve expert testimony regarding the responses of a child molestation victim. Expert testimony on the common reactions of a child molestation victim is not admissible to prove the sex crime charged actually occurred. However, CSAAS testimony "is admissible to rehabilitate [the molestation victim's] credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.]" ' [Citations.] Moreover, it appears that

11

our Supreme Court reached the same conclusion in *People v. Brown* (2004) 33 Cal.4th 892, 906, in which case we are bound by its reasoning. [Citation.] Here, we reiterate, the victim's testimony on direct examination was inconsistent with her prior statements in a way that tended to exculpate defendant. ' " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. . . .' [Citation.]" ' " (*People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

While defendant acknowledges the admissibility of expert testimony about CSAAS generally, he asserts it should not have been admitted in this case. Specifically, he argues there was no indication the jurors had any misconception about child molestation that required an explanation through expert testimony.

A review of the record shows the testimony was properly admitted in this case. For example, there were conflicting disclosures about the molestations among the three victims. Specifically, L.D. at first said that defendant was violent when he molested him, but later changed his story. In addition, the characteristics of helplessness, secrecy and entrapment in a child suffering from CSAAS were present and demonstrated by the victims' silence about the molestations for years, including months when defendant was living in the same apartment with them. Finally, the defense attorney attacked the credibility of the victims, arguing they gave inconsistent stories about the abuse, and failed to report the abuse for a period of time.

The expert testimony was properly admitted in this case to explain the behavior of the victims that was consistent with CSAAS.

### *Cumulative Error*

Defendant claims that the court committed cumulative error by its admission of evidence of Acevedo's conviction, the evidence that E.D.'s family was threatened and the evidence regarding CSASS.

12

"The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)

As stated above, we find no error in the trial court's admission of evidence in this case, and are satisfied that he received a fair trial and we deny his claim.

### *Restitution*

Defendant argues the matter should be remanded for a new hearing, because the trial court abused its discretion in setting the amount of victim restitution. Alternatively, defendant asserts this court should correct the abstract of judgment to reflect the correct amount of restitution ordered by the court. The Attorney General concedes regarding the latter remedy.

Penal Code section 1202.4 provides, "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Pen.Code, § 1202.4, subd. (f).)

On appeal, we review the trial court's restitution order under the deferential abuse-of-discretion standard. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542) If there is a rational and factual basis for the order, no abuse of discretion will be found. (*Ibid.*) However, a restitution order premised upon a demonstrable legal error cannot stand. (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.)

Here, the trial court ordered defendant to pay restitution in the amount of $3,267 to the Claims Board for E.D.'s psychological sessions related to the molestation. The court

13

stated that if Acevedo had also been ordered to pay that amount as restitution, the court would make defendant's order joint and several.

Defendant's argument that the trial court erred concerns the fact that it did not differentiate the amount of restitution attributable to his conduct as opposed to Acevedo's. Defendant asserts Acevedo should bear the brunt of the costs associated with E.D.'s psychological treatment, because E.D. repeatedly said that Acevedo's molestations were more frequent and serious than his.

Restitution orders may lawfully be imposed jointly and severally regardless of another defendant's proportionate level of culpability. (*People v. Madrana* (1997) 55 Cal.App.4th 1044, 1051 [restitution order under Pen.Code, § 1202.4]; *People v. Campbell* (1994) 21 Cal.App.4th 825, 834 [restitution ordered as condition of probation]; *People v. Zito* (1992) 8 Cal.App.4th 736, 745 [restitution order under former Gov. Code, § 13967].)

Here, although the order was not, in fact, joint and several, the same principles apply. We do not find the court abused its discretion in ordering defendant to pay the full amount of restitution for E.D.'s psychological treatment. Both defendant and Acevedo molested E.D., and caused her psychological harm for which she needed treatment. Moreover, defendant does not deny that that E.D.'s counseling was based in part on his acts of molesting her. It would be virtually impossible to set a percentage of psychological harm attributed to one defendant over another in this case.

### *Correcting the Abstract of Judgment*

Defendant asserts that in the event we do not remand this case for a restitution hearing, we should correct the abstract of judgment to reflect the actual amount of restitution ordered by the court. The Attorney General concedes this point.

Here, the abstract of judgment shows a restitution amount of $3,537, whereas the oral record at sentencing reflects an amount of $3,267. To confuse matters further, in an attachment to the abstract of judgment, the restitution amount stated is $32,067.

14

When there is an inconsistency between the oral and written record, the oral record prevails (*People v. Mesa* (1975) 14 Cal.3d 466, 471).  Therefore, we will order the abstract of judgment corrected to reflect a restitution amount of $3,267.

## DISPOSITION

The abstract of judgment is corrected to state that defendant must pay a restitution amount of $3,267.  As modified, the judgment is affirmed.

_____

RUSHING, P.J.

WE CONCUR:

_____

PREMO, J.

_____

ELIA, J.